DONALDSON, Judge.
Renasant Bank f/k/a M & F Bank appeals the judgment entered by the Shelby Circuit Court (“the trial court”) in favor of A.W. Clark and Janice Clark on Rena-sant’s claims seeking to have the Clarks ejected from possession of certain commercial property (“the property”) in Shelby County and seeking to recover damages from the Clarks for the fair rental value of the property. The trial court excluded testimony offered by Renasant from two witnesses who sought to give opinions regarding the fair rental value of the property. Because we hold that one witness should have been permitted to give an opinion regarding the fair rental value of the property, we reverse the judgment to the extent it denied the claim of Renasant seeking damages.

Facts and Procedural History

At some point before these proceedings began, the Clarks owned the property and entered a mortgage agreement with Rena-sant’s predecessor in interest, M & F Bank. The mortgage secured a debt owed by the Clarks. The debt was discharged in bankruptcy proceedings in January 2010; however, the property was still subject to the mortgage with the possibility of foreclosure. On October 19, 2012, the Clarks entered a settlement agreement with M <& F Bank in an effort to keep the property. Pursuant to the agreement, the Clarks executed a quitclaim deed conveying the property to M & F Bank together with an easement located on adjacent land owned by the Clarks that connected the property to a highway. Under the terms of the agreement, M & F Bank agreed that it would not record the deed before December 17, 2012. Pursuant to the agreement, if the Clarks had paid M & F Bank $895,000 by December 17, 2012, M & F Bank would have delivered the deed back to the Clarks and released the mortgage on the property; otherwise, M & F Bank would have full ownership of the property. The record shows that the Clarks failed to make the $395,000 payment in accordance with the agreement, and M & F Bank recorded the quitclaim deed in the Shelby Probate Court on December 18, 2012. At that time, the property was encumbered by multiple judgment and tax liens that had been incurred during the time the Clarks owned the property.
M & F Bank foreclosed on the mortgage on the property on March 8, 2013. On November 11, 2013, Renasant, as successor to M & F Bank, filed a complaint against the Clarks in the trial court. In the complaint, Renasant sought to have the Clarks ejected from possession of the property and also sought the fair rental value of the property during the time of their alleged unlawful possession, pursuant to § 6-6-280, Ala.Code 1975.[1]
*869 The Clarks did not file a timely response to the complaint, and Renasant applied for an entry of default. The clerk of the trial court entered a default against the Clarks on December 20, 2013. A hearing was held on Renasant’s request for a default judgment. The trial court entered a judgment of default pursuant to Rule 55(b)(2), Ala. R. Civ. P., on March 13, 2014, but it did not rule on Renasant’s request for damages. Thereafter, the trial court issued two writs to restore possession of the property to Renasant. The words “Restored to [Renasant]” were handwritten on the return of one of the writs.
On May 29, 2014, Renasant applied for a default judgment against the Clarks for the fair rental value of the property during the time the Clarks were allegedly in unlawful possession of the property. In the application, Renasant sought $142,500 for the period from October 19, 2012, to May 19, 2014. By agreement with Renasant, the Clarks were given additional time to answer. The Clarks filed an answer, and following the denial of Renasant’s motion for a summary judgment, the case was set for trial.
On March 2, 2015, the trial court conducted a nonjury trial. During the proceedings, the trial court sought to clarify the remaining issues, and the following discussion occurred:
“THE COURT: The ejectment, I mean, that’s not an issue anymore; is— am I correct? They’ve vacated the property. And that’s — so that part’s not an issue. We’re just here strictly on the money damages today; is that right?
“[Renasant’s counsel]: Yes, sir.
“[Clarks’ counsel]: Yes, sir.
“THE COURT: I mean, that’s what we’re here on.
“[Clarks’ counsel]: Yes, sir. They— they had — we’re going to say
“THE COURT: I understand.
“[Clarks’ counsel]: — they had already left the premises.
“THE COURT: I understand where you’re headed.”
Renasant presented testimony at the trial from James May, in-house legal counsel for Renasant, and Mary Dunnaway, the realtor hired by Renasant to sell the property. May testified that he worked for Renasant and that he was involved in preparing the documentation relating to foreclosed properties, including documentation concerning the leasing of those properties. Although May testified that he had never personally visited the property in this case, he testified that he was familiar with the property from reviewing Renasant’s records, maps, and photographs of the property and from handling the issues arising from the Clarks’ nonpayment of the mortgage, including the negotiation of the settlement agreement between M & F Bank and the Clarks. May testified that Rena-sant did riot obtain possession of the property until the sheriff’s office executed the writ of execution on May 8, 2014, and that the Clarks did not pay Renasant any rent between December 18, 2012, the date M & F Bank, Renasant’s predecessor, obtained full ownership of the property pursuant to the settlement agreement, and May 8, 2014. Renasant attempted to ask May to give an opinion regarding the fair rental value of the property for that period:
“[Renasant’s counsel]: Okay. And— and how much do you estimate the lost rent is over that eighteen-month period?
*870 “[Clarks’ counsel]: Your Honor, I object. No foundation as to what the rent would be. There was no agreement for rent. No testimony about that.
“THE COURT:. At this point I’ll sustain.
[[Image here]]
“[Renasant’s counsel]: Okay. And based on your professional judgement, what would have been a reasonable rental for that property over the eighteen months that they should have vacated?
“[Clarks’ counsel]: Your Honor, I still object to the foundation.
“THE COURT: Sustained.
“[Renasant’s counsel]: What would be your estimate of the- damages for inability to market the propeity? '
“[Clarks’ counsel]: Your Honor, I object. Same objection.
“THE COURT: Sustained.”
Dunnaway testified that she had been a realtor in Shelby County for over eight years, that she had sold commercial and residential properties in the same area, that she had leased commercial properties in the area, and that she was familiar with reasonable rental rates for commercial properties in the area. She testified that she had been to the property to show it to potential buyers. Although Dunnaway testified that she was not sure of the exact boundary between the property and the adjacent property still owned by the Clarks, she was familiar with the general property description. She also testified that a gate had blocked her access to the property and that an appraiser of the property was asked to leave by a neighbor, whom she presumed was one of the Clarks. She testified that she was the realtor who sold the property in December 2014. In particular, Dunnaway testified as follows on direct examination by counsel for Renasant:
“Q. How long have you been a Realtor marketing commercial properties in Shelby County, Alabama?.
“A. Since 2006 probably.

U

“Q. And how many would you estimate, like, bank-owned foreclosed properties have you sold?
“A. Probably — maybe three or four commercial. But residential, I’ve sold probably about twenty-something in the past few years.
“Q. And your Realty company that you work for, which one is it?
“A. Down South.
“Q. And where is it located?
“A. Wilsonville.
“Q. And this Clark property is on— off of Highway 119, correct?
“A. Correct.
“Q. What city would that be?
“A. Alabaster.
“Q. Are you familiar with that area?
“A. I am. I’ve got another property I just listed for one point one million. It’s eleven acres there in Alabaster. It’s commercial.
“Q. Have you marketed other properties in that area?
“A. Uh-huh. Sold the one behind Publix, which is across the street from this property, in May of last year. And it was commercial. It was a bank-owned. .
“Q_ [Y]ou eventually, .after the sheriffs got the Clarks off, sold this property for. three hundred and forty-five thousand dollars, correct?
“A. I did. Correct. In December.
“Q. And based on your experiences as a commercial Realtor and your familiarity with this particular area, in particular, what would be a reasonable rent for this property?
*871 “[Clarks’ counsel]: I object ... to reasonable rent.
“THE COURT: — sustain. I still don’t think you’ve laid a proper foundation for this witness to testify ábout that. '
“[Renasant’s counsel]: I mean, she’s a Realtor in the area. Has listed properties in the area, sold properties in the area.
“THE COURT: [Renasant’s counsel], she hasn’t testified she’s rented a single property.
“Q. Have you ever leased any commercial properties?
“A. I’ve leased the — I’ve got some duplexes in Chelsea that was a foreclosed piece of property leased. And then I leased probably about eight — I handle about eight leases on residential. And had another commercial I leased-r-a couple commercial properties I lease. >
“Q. Are you familiar with- what would be reasonable rental rates for commercial properties in the area that the Clarks’ property is?
“A I am.
“[Clarks’ counsel]: Your Honor, I still object to her testifying about that.
“THE COURT: At this point I’m going to sustain.”
The Clarks did not present any witnesses on their behalf. After the close of evidence, the Clarks moved to “dismiss” the claim for damages, arguing that Rena-sant had failed to prove any rental value of the property. The trial court and counsel for the parties had the following discussion before adjourning:
“THE COURT: Well,, here’s what I don’t have before me. I don’t have before me any expert testimony, in my opinion, as to the fair market rental value of that place during any of this time. Your first witness, I. don’t — I think testified — I don’t think he’s ever . been out there.
‘Tour second witness is a Realtor. I — don’t know of her having any experience in the rental of commercial property. ■ Or I didn’t hear any expert testimony from her about leasing or renting commercial real estate. So, what is the measure of damages?
“[Renasant’s counsel]: Well, the—
“THE COURT: Based on the testimony so far, .
“[Renasant’s counsel]: Well, one way to measure the damage would be based on the purchase price. And she sold it for three hundred and forty-five thousand dollars. And normal rent’s a good estimate of that would be spread that over fifteen years at a reasonable rate, what would the payment be calculated at. And that was twenty-seven hundred dollars.
“THE COURT: Yeah. But there’s— nobody’s testified — I understand that’s your conclusion. But I haven’t heard any expert testimony saying that that’s what the fair market rental of that property is. Nobody put on any testimony that that’s how a fair market — a fair market rental would be calculated based on the amount it sold for over some fifteen-year period of time. I’m just not ' sure I understand the bank’s position on ’ it — on the fair market rental value.
[[Image here]]
“[Renasant’s counsel]: You know, I mean, we could submit an affidavit from an appraiser or something, if we could (inaudible) one.
“THE COURT: Today’s trial date. I’m going to grant your motion.
“[Clarks’ counsel]: Thank you, Your Honor.”
On March 4, .2015, the trial court entered the following judgment:
*872 “1. The parties stipulated that [the Clarks] were not in possession of the real property, at issue and therefore, by agreement, the. ejectment count is dismissed.
“2. The only remaining issue was the fair rental value of property [Renasant] claims [the Clarks] previously unlawfully possessed.
“3. At the conclusion of [Renasant’s] case [the Clarks], through counsel, orally made a motion to dismiss [Renasant’s] claims for damages as [Renasant] failed to establish any monetary damages.
“4. The Court agrees [Renasant] failed to establish any monetary damages and therefore [Renasant’s] claim for monetary damages is dismissed. The Court finds in favor of [the Clarks] as to all claims of [Renasant].
“5. All other relief requested by either party is denied.”[2]
On March 20, 2015, Renasant filed a notice of appeal to the Supreme Court of Alabama, which transferred the appeal to this court pursuant to § 12-2-7, Ala.Code 1975.

Discussion

Renasant argues that the parties’ stipulation that the Clarks were no longer in possession of the property at trial does not support the trial court’s dismissal of its ejectment claim insofar as it sought the recovery of possession of the property from the Clarks. “A claim of ejectment is ‘considered a mixed action for the recovery of land and for damages for the use and occupation of the land.’ ” Jackson v. Davis, 153 So.3d 820, 824 (Ala.Civ.App.2014) (quoting I Jesse P. Evans III, Alabama Property Rights and Remedies § 20.1[b](5th ed.2012)). “To succeed in an ejectment action, a plaintiff must show that he or she has legal title to the premises. and that the defendant entered the premises and unlawfully remains there.” Barber v. Barber, 185 So.3d 455, 459 (Ala.Civ.App.2015)(citing § 6-6-280, Ala. Code 1975). During the trial, the parties agreed that the Clarks had vacated the property by the time of the trial. Because the Clarks were no longer in possession of the property, the parties further stipulated that the only issue remaining for trial was that of damages. The trial court could have determined that Renasant sought to dismiss its claim for ejectment. Renasant did not object to that characterization at trial, nor did Renasant file any post-judgment motion seeking to correct that characterization in the judgment. We conclude that the pai’ties’ stipulation that the Clarks were no longer in possession supports the trial court’s dismissal of Rena-sant’s claim insofar as it sought the recovery of possession of the property from the Clarks. We also note that the judgment entered on March 13, 2014, on Renasant’s claim for ejectment was an interlocutory judgment because it did not rule on the issue of damages. See Ex parte Family Dollar Stores of Alabama, Inc., 906 So.2d 892, 896 (Ala.2005) (“ ‘A default judgment that reserves the assessment of damages *873 is interlocutory and may be set aside at any time; once the trial court assesses damages on the default judgment, the judgment becomes final.’ ” (quoting Keith v. Moone, 771 So.2d 1014, 1017 (Ala.Civ.App.1997), rev’d on other. grounds, Ex parte Keith, 771 So.2d 1018 (Ala.1998))); Palmer v. SunBank & Trust Co., 689 So.2d 152, 153 (Ala.Civ.App.1996)(“the order of ejectment awarding possession without addressing the pending damages claim is not a final appealable order”). The interlocutory judgment was subject to modification or to being set aside at any time before entry of the final judgment, and, therefore, nothing precluded the subsequent dismissal of the ejectment claim before the entry of the final judgment. We cannot hold that the trial court committed reversible error by construing Re-nasant’s statements at trial as agreeing to a dismissal of the ejectment claim, particularly when Renasant never sought to correct the construction at trial and fails to establish on appeal how its interests have been adversely affected by the absence of a judgment for possession on its ejectment claim.
Renasant next contends that the trial court erred in excluding evidence proffered by May and Dunnaway regarding the fair rental value for the property. On appeal, Renasant presents the argument that May and Dunnaway were not required to be qualified as expert witnesses in order to testify as to the fair rental rate value of the property. Rena-sant asserts that May should have been allowed to testify to the fair rental value as the corporate representative of the property owner and that the proffered testimony from May and Dunnaway was admissible under § 12-21-114, Ala.Code 1975, which provides: “Direct testimony as to the market value is in the nature of opinion evidence; one need not be an expert or dealer in the article, but may testify as to value if he .has had an opportunity for forming a correct opinion.” However, Re-nasant never presented either argument in the trial court. Renasant did not object to the trial court’s determination that expert testimony was required to be presented to support the claim for rental-value damages. When the Clarks objected to the introduction of testimony from May and Dunnaway regarding the fair rental value of the property, Renasant never raised the argument that their proffered testimony was admissible under § 12-21-114 or that May’s proffered testimony was admissible because he was Renasant’s corporate representative. Based on the discussions in the transcript, Renasant appeared to agree with the trial court’s determination that expert testimony on the issue was required by offering to provide an affidavit from an appraiser regarding the fair rental value of the property. The trial court, therefore, was never given the opportunity to rule on whether the proffered testimony of May and Dunnaway regarding the fair rental value was admissible under § 12-21-114 or upon May’s status as a corporate representative of Renasant. See Andrews v. Merritt Oil Co., 612 So.2d 409, 410 (Ala.1992) (“This court cannot consider arguments raised for the first time on appeal; rather, our review is restricted to the evidence and arguments considered by the trial court.”); Walker v. Dutton, 401 So.2d 32, 32 (Ala.1981) (citing Rule 46, Ala. R. Civ, P.) (holding a party adversely affected by a ruling must apprise the trial court of any objection to the ruling and the grounds for such objections in order to preserve the issue for appeal). Accordingly, we will consider only whether May or Dunnaway should have been permitted to testify as an expert witness.
“If scientific, technical, or other specialized knowledge will assist the trier *874 of fact to understand the evidence or determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.” Rule 702(a), Ala. R. Evid.[3] “[T]he determination of whether a witness will be allowed to testify as an expert is a matter within the discretion of the trial court.” Cherokee Elec. Coop. v. Cochran, 706 So.2d 1188, 1198 (Ala.1997) (citing Griffin v. Gregory, 355 So.2d 691, 692 (Ala.1978)). We will reverse that determination only if the trial court has exceeded its discretion. Id. “An expert is defined as ‘anyone whose opportunity or means of knowledge in a specialized art or science is better,than that of the average juror or witness,’ Smoot v. State, 520 So.2d 182[, 189] (Ala.Crim.App.1987), such that his testimony will aid the jury.” Macon Cnty. Comm’n v. Sanders, 555 So.2d 1054, 1058 (Ala.1990) (citing Glaze v. Tennyson, 352 So.2d 1335 (Ala.1977)). “[UJnder Rule 702 ‘qualification’ should continue to be defined broadly, so that one may gain an expertise through practical experience as well as through formal training or education.” Advisory Committee Notes (1972 Proposed Rules), Rule 702, Ala. R. Evid.; see also Advisory Committee Notes, Rule 702, Fed.R.Civ.P. (“Thus within the scope of the rule are not only experts in the strictest sense of the word, e.g., physicians, physicists, and architects, but also the large group sometimes called ‘skilled’ witnesses, such as bankers or landowners testifying to land values.”).
“The quantum of necessary expertise is not fixed; rather, it is determined by whether it is sufficient to justify an opinion that will be of aid to or assist the trier of fact— [T]he key determination is not the witness’ profession or calling, but whether the witness possesses expertise that will be of assistance to the trier of fact. The witness, of course, does not have to be the most qualified in the field and, indeed, may even have weaknesses in his qualifications..,”
I Charles Gamble and Robert J. Goodwin, McElroy’s Alabama Evidence § 127.02(2)(a) (6th ed.2009)(footnotes omitted).
May’s testimony established only that he worked for the mortgage company involved in the proceedings and that he had familiarity with the documents generated and produced in conjunction with foreclosure proceedings, including, at times, documents relating to the rental of land. There was no indication in his testimony that he had any expertise in determining the appropriate amount of rental value of any commercial land, much less commercial property comparable to the property in this case. We hold that the trial court was well within its discretion to determine that May had not been shown to have an expertise on the issue and, thus, to exclude any testimony from May as to the fair rental value of the property.
Dunnaway, however, testified that she had been a realtor working in the same geographic area as the property, that she had sold commercial properties in the area, that she had leased commercial properties in the area, and that she was familiar with reasonable rental rates for commercial properties in the area. Although the trial court indicated that it did not hear any testimony that Dunnaway had experience in renting commercial real estate, the record appears to show that she *875 claimed to have such experience. The trial court, as the finder of fact, would have been free to consider the weight to assign to Dunnaway’s opinion as to the fair rental value of the property, and the Clarks’ counsel would have had the opportunity to cross-examine Dunnaway regarding any such opinion. Based on the record before us, we conclude that Renasant demonstrated Dunnaway’s qualifications as an expert witness to render an opinion as to the fair rental value of the property. We therefore reverse the judgment as to. Renasant’s damages claim, and we remand the cause for further proceedings in accordance with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
THOMPSON, P.J., and PITTMAN, THOMAS, and MOORE, JJ., concur.

. Section 6-6-280 provides, in pertinent part:
"(a) A plaintiff commencing an action for the recovery of lands or the possession thereof has an election to proceed by an action of ejectment or by an action in the nature of an action of ejectment as is provided in subsection (b) of this section.
"(b) An action for the recovery of land or the possession thereof in the nature of an action in ejectment may be maintained without a statement of any lease or demise to the plaintiff or ouster by a casual or nominal ejector, and the complaint is sufficient if it alleges that the plaintiff was possessed of the premises or has the legal title thereto, properly designating or describing them, and that the defendant entered thereupon and unlawfully withholds and detains the same. This action must be commenced in the name of the real owner of the land or in the name of the person entitled to the possession thereof.... The plaintiff may re *869 cover in this action mesne profits and damages for waste or any other injury to the lands, as the plaintiffs interests in the lands entitled him to recover, to be computed up to the time of the verdict.”

. Although the Clarks moved to "dismiss” the damages claim at the conclusion of the proceedings, the correct motion is now a " ‘motion for judgment on partial findings.’ ” Wright v. Hatley Health Care, Inc., 980 So.2d 1024, 1029 (Ala.Civ.App.2007) ("Rule 52(c)[, Ala. R. Civ. P.,] has supplanted Rule 41(b), Ala. R. Civ. P., which formerly governed motions for an involuntary dismissal in nonjury cases.”); see Committee Comments to Octo-her 1, 1995, Amendment to Rule 41, Ala. R. Civ. P. ("This amendment [to subdivision (b) ] deletes the provision for dismissal by the court in a nonjury case for failure of proof. This matter is now covered by Rule 52(c)[, Ala R. ■ Civ. P.].”). We therefore construe the "dismissal” of the claim for damages as a judgment on partial findings, pursuant to Rule 52(c), based on Renasant’s failure of proof as to that claim.

. Neither party contends that the admissibility of any testimony was dependent upon the factors listed in Rule 702(b), Ala. R. Evid., which provides the requirements for admissibility of expert testimony “based on a scientific theory^ principle, methodology, or procedure.”